No. 18,473.

THE EMPIRE DISTRICT ELECTRIC COMPANY, *Appellee*, v. THE EUREKA MINING COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

CONTRACT—*Corporation—Mining Company—Contract Made by General Manager—Binding on Corporation.* A, an owner of certain mining property in Cherokee county, agreed with an investment company of Chicago that the latter should build thereon and equip a mill, and when completed the improved property was to be transferred to a corporation, A to have one-third of the stock. The corporation was organized. A was placed in charge of the improvement with power to purchase material and employ and discharge workmen, the investment company, whose officers were officers of the corporation, furnishing the funds and giving some directions, leaving many things to the judgment of A, who was on the ground. Upon the completion and equipment of the mill, the improved property was turned over to the corporation, whose officers and the officers of the investment company had consulted and advised with A frequently touching the mill and the power to be used. Soon after the property was turned over A was elected a director, made general manager at a monthly salary of $200, and his duties prescribed as the superintendence of the mining property, and the payment of the same salary theretofore made was ratified and approved, one-third of the stock having already been delivered to him. Shortly before such action, but after the delivery of the stock, A, in the name of the corporation, contracted for electric power to be supplied the mill for a period of three years. He remained as general manager for several months, during which time, and long thereafter, such power was furnished and used. *Held*, that the corporation is bound by such contract.

Appeal from Cherokee district court; EDWARD E. SAPP, judge. Opinion filed December 6, 1913. Affirmed.

*Truman T. Burr*, of Galena, and *Jesse R. Long*, of Chicago, Ill., for the appellant.

*William F. Sapp*, and *Andrew S. Wilson*, both of Galena, for the appellee.

Electric Co. v. Mining Co.

The opinion of the court was delivered by

WEST, J.: The defendant appeals from a judgment for electric power furnished by the plaintiff, who alleged a right to recover both on contract and on *quantum meruit*. The defendant denied that the contract was authorized, but the court expressly found that it was. While testimony was offered as to the value of the power furnished, no finding as to this was made. The plaintiff contends that the finding of authority was unsupported by and contrary to the evidence. The other side maintains that it was well sustained, and that in addition the testimony showed the plaintiff entitled to recover on the *quantum meruit* theory and that the general conclusion of law in favor of the plaintiff must be presumed to have embraced this feature of the case.

If the finding in regard to the contract is in fact justified by the evidence, no further inquiry need be made. It was signed "The Eureka Mining Company, Consumer. By A. O. Ihlseng," and was executed January 18, 1910. The question turns upon the authority of Mr. Ihlseng. It appears that in January, 1910, an agreement was made between the Campbell Investment Company and Mr. Ihlseng, who had acquired leases to certain mining property in Cherokee county, that the Campbell Investment Company should furnish money to construct a mill upon the leased property, which property was to be turned over to a mining company to be organized, Ihlseng to have one-third of the $150,000 capital stock. The company was organized under the laws of Maine in February, 1909. October 9, 1909, Ihlseng and wife and the Campbell Investment Company, by joint instrument, conveyed to the Eureka Mining Company their interests in the mining property, the acknowledgment not being completed until January 19, 1910. Early in 1909 Ihlseng took charge of the construction of the mill on the mining property, pursuant to instructions from the Campbells, who fur-

nished the funds as they were needed and kept up a correspondence with him during the progress of the work. At a meeting of the mining company at Portland, Maine, February 8, 1910, Mr. Ihlseng was recorded as voting five thousand shares by proxy, and at the same meeting he was elected one of the five directors. It was also voted to ratify and endorse the transactions of the board for the past year. The minutes recited the contract for the purchase, development and improvement of the Kansas mining property, the sinking of a shaft thereon and the construction and equipment of a double mill thereon of the capacity of 300 tons per shift; also, the transfer of the leases, the improvement and development thereof, and the issuing of 14,990 shares of stock in payment therefor; "And whereas, the said property has been developed and improved, and the said leases transferred to the company; And whereas, it is the opinion of the stockholders of this company that the said deal was to the best interest of this company; Now therefore, be it resolved, that the said contract of purchase and for the development and improvement of said property, be, and the same is hereby ratified, and the acts of the board of directors in entering into the same and in carrying the said contract (into) effect, and the issuance of the capital stock of this company to the extent aforesaid, and all the acts of the board of directors of this company and of its officers, in and about the same, be, and the same are, hereby approved, ratified and confirmed." At a meeting of the directors held at Chicago, March 19, 1910, salaries of the officers of the company for the ensuing year were discussed but not fixed, except that of Mr. Ihlseng as general manager or superintendent, which was fixed at $200 a month, payable monthly, until the same might be changed: "The salary of Mr. Ihlseng of Two Hundred ($200) Dollars per month heretofore paid was approved and the officers' acts in making such payments were duly ratified." The office of general

manager was created and the duties of the same fixed as the superintendence of the company's mining property near Galena, Kan., and Mr. Ihlseng was elected to fill such place at the pleasure of the board, and accepted. January 15, 1910, The Campbell Investment Company, by D. C. Campbell, president, enclosed to Mr. Ihlseng 5000 shares of stock in the Eureka Mining Company, "according to the agreement made with you over a year ago, in reference to a Company to be formed by myself." Mr. Ihlseng remained in charge of the mining property until in July, 1910. He testified that at the date of the execution of the contract he was in charge of the Eureka Mining Company in Galena and had been for about a year prior thereto; that he was in charge of the building of the mill on the property, pursuant to instructions by Mr. Campbell, one of the officers of the company; that he had charge of employing labor and purchasing supplies, Mr. Campbell having something to say about the property, he, Ihlseng, being on the ground in charge of the work. When funds were received from Mr. Campbell, Ihlseng deposited them and paid bills therefrom, and notified Mr. Campbell when he needed more. D. C. Campbell was president, and C. P. Campbell treasurer. That he executed the contract on behalf of the company and was authorized to do any and all things in the operation of the company; that he was to turn over to the company the mining leases and to have one-third of the stock, and the Campbell Investment Company was to furnish $30,000, the property to be turned over to the Eureka Mining Company as a developed property; that in January, 1910, he discussed with the Campbells, in Chicago, the proposed contract with the electric company, and one of the directors, Mr. Payne, objected that the company ought not to pay for electricity not consumed; that the matter was finally decided in a general conversation with Mr. Campbell; that the kind of motive power that should be used was the subject of discussion every time he met

Mr. Campbell; that he consulted with Mr. Campbell about purchasing the electric machinery, and generally kept him advised as to the operations of the Eureka mines. "Sometimes I advised him before the doing and sometimes after, because, as Mr. Campbell said, I was on the ground and was the best judge of conditions." In a letter from C. P. Campbell, January 7, 1910, in which a desire to see production begin at the earliest possible moment was expressed, reference was made to Ihlseng's supposed decision to buy a Miller gas engine: "I would not delay this matter any length of time. We, at this end, can not decide the question, for we do not know all the conditions and circumstances that enter into it and hence, we will have to depend upon you to decide it, and I would do it at once." In a letter written in December, previous, preference for a motor instead of a gas engine had been expressed by Mr. Campbell, and the letter closed with the statement that the writer would keep the power contract, which seemed to be a fair one, "even adding the $150 per month maintenance charges, and shall await hearing from you further in reference to the whole subject before writing you definitely." January 20, 1910, two days after the contract was signed, C. P. Campbell wrote:

"In reference to the motor which you say will be ready the first of February: Was this the 100 H. P. motor you spoke of in your letter of November 6th which the General Electric promised to deliver to you F. O. B. Kansas City, $1080.00? I know we have been rather up in the air on this motor question and I trust that we will have this motor delivered promptly so as to have no hitch there."

The plaintiff's general manager testified that when the bill sued on was discussed with Mr. Campbell after the action was begun no objections were made on the ground of any lack of authority on the part of Ihlseng to sign the contract. The witness knew that Mr. Ihlseng employed and discharged men and purchased material and "was the sole representative of the Eureka

Mining Company in that district." It was shown that employer's liability and fire insurance was taken out by Ihlseng in behalf of the company. Hardware was purchased by him, and lumber, and were paid for by the Chicago office or by Mr. Campbell. Mr. C. P. Campbell testified, among other things: "All the time this mill was being built and operated, while Mr. Ihlseng· was there, he purchased all the supplies that were used. He was the man on the ground there and made all the contracts that were made." On redirect examination he said that he meant by this that Ihlseng was acting under the old Campbell Investment Company and not on behalf of the Eureka Mining Company, but that "While he was connected with the Eureka Mining Company and before he became an officer of the company, Mr. Ihlseng's duties were as a sort of superintendent on the ground and hired and discharged the men."

Much more could be quoted in support of the finding made by the trial court, and while there was considerable evidence to the contrary a fair deduction from it all is that Ihlseng was to put in the leases and the Campbells to put the property in shape to be productive, when it was all to be turned over to the Eureka Mining Company, Ihlseng to have one-third of the stock. While the work was going on the corporation had been organized and was holding meetings, and among other things done by Ihlseng to get the property in shape to be productive was the signing of the contract sued on, which had been subjected to considerable discussion with other members of the mining company, and the results of which were received and accepted for a long time after actual possession was taken by it. The bill for the service involved in this action, so far as the maintenance charge of $150 a month is concerned, covers the time from July, 1910, to April 15, 1911, inclusive. This fixed maintenance charge is the matter over which all the contention arises. The pres-

ent officers of the company must have known that the plant was being operated by electric ·power furnished by the plaintiff, and they certainly· knew that the former · superintendent · in charge. had dealt with the electric company in respect ·thereto.   But aside from the knowledge of the situation, actual and presumptive, possessed by the defendant's other officers, Ihlseng was not the mere agent of ·the Campbell Investment Company as now claimed.   He was also a third contributor to and owner of the property and stock of the mining company· as well as its superintendent, and in fact its general manager.   For while the office of ·general manager ;was ·not ·expressly created and a monthly salary of $200 fixed until. March. 19, still on that date the· previous payment of the same salary ·was approved, and his future duties were prescribed as the superintence of the property—precisely what they had been before; so that he is shown to have been acting in the capacity of general manager whatever word he used to define his position:   He· had been placed in charge to hasten the day when the property could become productive.  Locally he was the company's sole exponent. and representative.  · The will of the other owners had united with his in placing him in this situation for their common advantage.  He was one-third of the body corporate, and the other two-thirds could not say "We have no need of thee."   While the formality of actually transferring the title to the developed property over to the company was not observed until February 8, still on January 18, previous, when the contract was executed, the Eureka Mining Company was substantially and essentially its owner, possessor and operator.

A careful consideration of the entire record leaves us so convinced that the trial court's finding was correct that it is not deemed necessary to discuss any of the numerous authorities cited in the briefs.   Were it a question of ratification only, such discussion might

be necessary, but the case is one of original authority followed by abundant knowledge, recognition and acceptance.

The judgment is affirmed.